In re Scott

*Philip Wallis* and *H. Gordon McCouch,* for accountant.

*Warwick Potter Scott,* for Edgar Scott, Warwick Potter Scott, Anna Dyke Scott Kennedy, Susan Bremer Sturgis Scott, Hugh Riddle and Baroness von Hutton.

*William Logan Fox* and *Paul Freeman,* for Anna Scott Hart and Fidelity-Philadelphia Trust Company, executors, etc.

*William Logan Fox,* for Anna Scott Hart, sole child of Betsy R. Fisher.

*Charles I. Thompson,* for Anna Scott Farnum, Helen Douglas Page and Thomas A. Scott.

*Frederick H. Knight* and *Bevan A. Pennypacker,* for Fidelity-Philadelphia Trust Company, administrator d. b. n. c. t. a. of the Estate of Thomas A. Scott, deceased.

*Thomas Ridgway, Jr.,* for Hugh D. Scott, Thomas Alexander Scott, Mary D. Scott Newbold Lane, and Fidelity-Philadelphia Trust Company, executor of Robert M. Riddle.

PARRY, J., November 8, 1934.—Fidelity-Philadelphia Trust Company has filed its account as trustee for John S. Riddle et al. under deed of trust of Thomas A. Scott dated March 15, 1880. Exceptions to the account were filed on behalf of various persons, on the ground that the trustee was bound to tender in distribution 66 bonds of Texas & Pacific Railway Company instead of certain other securities which now comprise the corpus of the trust. An exception was also filed to a credit taken for the distribution of $33,357.08 to the children of John S. Riddle upon his death in 1906. Finally, the fund now to be distributed is claimed by certain of the Riddle family and also by the administrator d. b. n. c. t. a. of the estate of Thomas A. Scott. From the stipulation of facts submitted by counsel and the proofs, I make the following

### Findings of fact

1. The accountant, Fidelity-Philadelphia Trust Company, is the trustee, as successor to Fidelity Insurance, Trust & Safe Deposit Company, under a deed of trust executed by Thomas A. Scott under date of March 15, 1880.

2. Thomas A. Scott, the settlor, died May 21, 1881.

3. The deed directed the trustee to pay the income from all securities transferred to it to the settlor's wife, Anna Dyke Scott, for life, and immediately after her death to set apart from the corpus of the trust estate securities of the face value of $100,000, hold them in trust and pay the income from them to

the settlor's mother-in-law, Mary I. Riddle, for life, and after her death to divide the income among the children of Mary I. Riddle as provided by the following portion of the deed of trust:

". . . . after her [Mary I. Riddle's] death to divide, share and share alike, the income of the said securities thus set apart amongst the children of her the said Mary I. Riddle, namely John S. Riddle, Betsy Fisher the wife of George Harrison Fisher, and Robert M. Riddle, or their descendants upon the principle of representation should any of said children be then dead, and to pay the income thereof to the said children for the maintenance and support of themselves and their families, or to the guardian or guardians of any descendants of said children, for their maintenance and education, and upon each of such descendants of said children attaining the age of twenty one years, then and in that event to pay over, assign and transfer to each their respective shares absolutely. But if such children should all die without issue, and if such descendants should all die without issue before attaining the age of twenty one years, then and in that event the securities thus set apart are to revert to and form a part of the said trust estate. . . ."

4. Under the said deed of trust the settlor deposited with the trustee certain securities, including 300 Consolidated Mortgage Eastern Division 6 percent bonds of the Texas & Pacific Railway Company, due June 1, 1905, having a face value of $300,000.

5. In 1884, Texas & Pacific Railway encountered financial difficulties and was unable to meet the interest charges on its bonds.

6. A plan of reorganization and an agreement to effect it were submitted to the bondholders, under which in 1887 they deposited their old securities and received instead new first and second mortgage bonds.

7. No new company was formed in the course of the reorganization, though there was a foreclosure sale under the old bonds which was never confirmed by any court of law or equity.

8. The trustee under the deed of trust entered into the reorganization agreement, surrendered the 300 Consolidated Mortgage Eastern Division 6 percent bonds of Texas & Pacific Railway set over to it in the deed of trust, and in exchange received Texas & Pacific Railway Company first mortgage 5 percent bonds due in the year 2000 of the face value of $346,050.

9. Mary I. Riddle died December 20, 1890.

10. The settlor's wife, Anna Dyke Scott, died February 21, 1901.

11. John S. Riddle, Betsy Fisher, and Robert M. Riddle, children of Mary I. Riddle, survived her and survived Anna Dyke Scott.

12. Upon the death of Anna Dyke Scott in 1901, the trustee set apart to itself as trustee securities of the face value of $100,000 for the benefit of the children of Mary I. Riddle, as directed by the deed of trust, and for this purpose it chose, with the consent of the beneficiaries, 100 of the Texas & Pacific 5 percent bonds due in the year 2000, which it had received under the plan of reorganization in 1887.

13. The income from the said 100 bonds was thereafter paid in equal shares to John S. Riddle, Betsy Fisher, and Robert M. Riddle, children of Mary I. Riddle.

14. John S. Riddle died July 22, 1906, survived by two children, Hugh H. Riddle and Bettina von Hutton, and no descendants of any deceased child.

15. Thereupon the trustee distributed 33 of the bonds held in trust for the Riddle family to the said children of John S. Riddle, sold one bond to cover various expenses and commissions, but filed no account at that time.

16. After this distribution, the trustee continued to pay the income on the remaining 66 bonds to Betsy Fisher and Robert M. Riddle.

17. During the years 1926, 1927, and 1928, the remaining 66 Texas & Pacific 5 percent bonds due in the year 2000, then in the hands of the trustee were sold and the proceeds invested in mortgages and other securities, which the trustee now tenders in distribution.

18. Betsy Fisher died September 16, 1932, survived by one child, Anna Scott Hart, and no descendants of any deceased child.

19. No distribution of principal was made after the death of Betsy Fisher.

20. Robert M. Riddle died on January 18, 1933, leaving no descendants surviving him.

## Discussion

The account now before the court for audit is the trustee's account of its administration of the separate trust created for the benefit of the Riddle family, wherein the trustee takes credit for the distribution of one third of the principal to the children of John S. Riddle in 1906. An exception to the credit so taken has been filed on behalf of certain grandchildren of the settlor, Thomas A. Scott, namely Hugh I. Scott, Thomas Alexander Scott, and Mary D. Scott Newbold Lane.

On behalf of various claimants, exceptions have been filed to the items in which the trustee charges itself with the proceeds of the sale of the Texas & Pacific 5 percent bonds, and those in which it takes credit for the investment of those proceeds in other securities. These exceptants claim they are entitled to receive in distribution 66 Texas & Pacific Railway 5 percent bonds due in the year 2000 or their equivalent in cash, as the deed of trust executed by Thomas A. Scott contains no gift of a power of sale to the trustee.

The account shows a balance for distribution which is claimed on the one hand by the children of John S. Riddle and the child of Betsy Fisher and on the other by the administrator d. b. n. c. t. a. of the estate of Thomas A. Scott, supported by certain descendants of Thomas A. Scott.

I turn first to the objections to the trustee's sale of certain Texas & Pacific Railway Company first mortgage 5 percent bonds due in the year 2000, which at one time comprised the principal of the trust fund.

The testimony of witnesses disclosed that in 1925 counsel for the life tenants, Betsy Fisher and Robert Riddle, inquired of the trustee whether it were possible to sell some of these bonds in order to diversify the investments in the trust. The trustee replied that the deed contained no power of sale and it was therefore impossible to change the investments.

An officer of the trustee company testified that a few years after this correspondence he discovered that the bonds held in trust for the Riddles were not those orginally transferred by the settlor but those substituted under the reorganization agreement. He came to the conclusion that, under the circumstances of the exchange, the trustee was not only empowered but was even under a duty to sell the bonds and invest the proceeds in legal securities. Consequently, the trustee sold the Texas & Pacific bonds and invested the trust funds in mortgages and other legal investments. It happens that today the estate would be larger had the bonds been retained.

The exceptants raise no objection to the trustee's coöperation in the reorganization plan in 1887 and admit that it was the only practical course open. They claim, however, that the bonds received in exchange were in reality not new securities but the old ones in different form and should never have been

sold. The trustee, on the other hand, contends they were so-called "salvage", which it was obliged to convert into legal securities.

The question then is whether the new bonds were the same as the old, not whether they were better or poorer investments. Counsel stipulated numerous facts and submitted a wealth of material for my consideration, from which it appears that the original bonds were the obligation of Texas & Pacific Railway Company, due June 1, 1905, bearing interest at 6 percent per annum and secured by a lien on 524 miles of tracks, known as the "eastern division", subject to two prior liens. The outstanding amount of the issue at the beginning of the receivership was $9,316,000.

The new bonds were also the obligation of Texas & Pacific Railway Company but they were due June 1, 2000, bore interest at the rate of only 5 percent per annum, and were secured not only by the same lien on the same 524 miles of track but also by a first lien on the remaining property of the railway (including approximately 963 miles of track). They replaced not only the Consolidated Eastern Division sixes but also several other bond issues secured by liens on the track and property of the railway. After the reorganization, the face value of the new bonds issued and outstanding was $21,049,000.

I cannot escape the conclusion that the securities of these two issues were altogether different. The old bonds were promises to pay 6 percent on a loan of $9,316,000 and to pay the principal in 1905. The new are promises to pay 5 percent on $21,049,000 and the principal in the year 2000, 95 years after the maturity of the original bonds. That the obligor on both promises was the same appears to me to be immaterial. It is urged that the new bonds grew directly out of the old ones, but the radical changes in the vital elements of the obligation lead unavoidably to the conclusion that they were new and different securities with which the old ones were bought in. If this be so, it was the trustee's duty to convert them into legal securities just as it would have been obliged to invest the proceeds if no reorganization had taken place and the old bonds had been paid off at maturity in 1905.

The exceptants next contend that, even if this be so, since the trustee chose those particular 5 percent bonds to form the corpus of the Riddle trust in 1901 it was thereafter, under the terms of the deed, prohibited from making any change. This argument is based on the words "to hold the same" in the deed, which provides:

"And immediately after the decease of my said wife, Anna Dyke Scott, to set apart from the corpus of the said trust estate securities of the face value of $100,000, and to hold the same, pay the income thereof, etc."

The settlor limited his trustee to the original investments transferred to it or to legal securities should a change be unavoidable. I find nothing in the passage quoted which lifts this limitation from the securities set apart for the Riddles. If they were "salvage" before the transfer they were such after, and the trustee remained under the same duty to convert them into legal securities.

The facts pertinent to the question of distribution may be thus summarized:

In 1880 Thomas Scott deposited with a trustee about $800,000 to be held in trust for his wife for her life. Upon her death, the trustee was directed to set apart $100,000 as a separate trust fund and to pay the income from it to Mary I. Riddle for life and after her death to her children Robert, Betsy, and John. John died in 1906 leaving two children; Betsy died in 1932 leaving one child; and Robert died in 1933 leaving no children. The question is who, under the deed of trust, are entitled to share in the distribution of the principal. Some of those interested in the settlor's estate concede that the children of John

were entitled to the one third of principal which they received in 1906 and that Betsy's child is now entitled to one third, but assert that there is no provision for the remaining one third, for Robert died without any descendants, and therefore it must fall back to the settlor's estate.

The children of John and Betsy, however, claim that they are entitled to this remaining third as well as to the share of their parents. Finally, a third group interested in the settlor's estate contends that the payment to John's children in 1906 was erroneous, as under the circumstances there is no gift in remainder to any of the Riddle family, that the trustee must be surcharged with the amount of this payment, and that the entire fund must now fall into the estate of Thomas Scott.

Referring to the language of the deed we find that the trustee is directed ". . . after her [Mary I. Riddle's] death to divide, share and share alike, the income of the said securities thus set apart amongst the children of her the said Mary I. Riddle, namely John S. Riddle, Betsy Fisher the wife of George Harrison Fisher, and Robert M. Riddle, or their descendants upon the principle of representation should any of said children be *then* dead . . ."

The word "then", counsel for the third group contends, refers to the moment of Mary Riddle's death, with the consequence that no descendants of such children as survived her would ever become entitled to share in either income or principal of the fund. But this construction results in there being no provision whatever in the deed for disposition of the remainder after the deaths of Riddle children who survived their mother, as they all did. This omission does not confront me and the whole portion of the deed relating to the Riddle trust becomes clear and complete if I take "then" to refer to any time the trustee makes a division of income. The deed does not direct the trustee to do any specific thing precisely as of the moment of Mary Riddle's death but does direct it, after her death, necessarily on repeated occasions, to divide and distribute the income; and the rational conclusion is that it must be to any one of these occasions that "then" refers. So construed, the language of the deed may be thus paraphrased: "Pay the income in equal shares to John, Betsy, and Robert. If at the time of payment one of them be dead, then pay his or her share of income [1] to the descendants of Mary Riddle's children on the principle of representation until they reach 21, then distribute to each the share of principal on which he has been receiving the income."

As a result, is it not perfectly clear that [2] Mary Riddle's children were to enjoy the income for life (a point left vague by the other construction) and that after these life estates in [3] the children the principal of the trust is given to their descendants as a class, to be distributed on the principle of representation as each descendant reaches the age of 21? [4] The gift is of income to the children of Mary Riddle "or their descendants upon the principle of representation should any of said children be then dead" and of the principal to "each of such descendants of said children" upon reaching the age of 21. In this language I find nothing to indicate that the descendants are to enjoy only their parents' share of the income and principal, though this would probably be the case if the settlor had made the gift to the descendants of each child or respectively to the descendants of said children. It follows that the settlor did not fail to provide for the contingency of [5] one of Mary Riddle's children dying without descendants, as Robert did, for on the death of any child the income formerly paid to him or to her and ultimately the principal from which this income was

NOTE.—Numerals in brackets refer to changes made in the language of this adjudication by the opinion sur exceptions, as indicated by the corresponding numerals appearing therein.

derived, is to go to [6] the descendants of the Riddle children as a class, not to the descendants of the particular child who died, except to the extent that this result is brought about by the application of the principle of representation.

The deed is finally completed, in respect to the Riddle trust, by the provision that "if such children should all die without issue, and if such descendants should all die without issue before attaining the age of 21 years" the principal of the trust is to revert to the balance of the original trust for the benefit of the settlor's own descendants. In this clause, "and" is obviously used in its disjunctive sense, instead of "or", as there could be no descendants to die before reaching 21 if all the children died without issue.

From all this I conclude that by the express provisions of the deed Betsy's child now takes the share formerly enjoyed by her mother, plus one half of the fund from which Robert received the income, and that John's children take the other half of this fund in equal shares and were entitled to the principal distributed to them after their father's death in 1906.

If there be doubt as to this, and we assume that the remainder given to the Riddle descendants are only of the parents' share in each case, so that there is no express provision for the disposition of Robert's share upon his death without issue, I am of opinion that the cross-limitation over to the Riddle descendants arises by implication.

Were this a deed to real estate the implication might not be drawn, but I am unable to see any distinction in principle between this deed to personalty and a will.

2 Jarman on Wills (7th Eng. ed.) 646, states the applicable rule:

". . . where property is given to several named persons as tenants in common during their respective lives, with separate remainders to their issue, and if they all die without leaving issue, then over, cross-limitations will be implied between the primary legatees (or devisees) and their families."

Cited to this text is the case of In re Clark's Trusts, 32 L. J. Ch. N. S. 525. There the testator left the residue of his estate in trust to divide the income among his four nieces, Hannah, Margaret, Elizabeth and Martha ". . . during the term of their natural lives respectively . . . ", and upon their deaths in trust for their respective children, with cross-remainders among the children of each family, and if they all die without children then over. At the time of the decision, one niece was still living and had children, two had died leaving children and one, Hannah, had died without children. The question was whether there was an intestacy as to Hannah's share. After reviewing the development of implied cross-limitations, Lord Hatherley, then Vice Chancellor Wood, held that Hannah's share should be distributed according to the limitations contained in the will of the original shares; that is, one third to the surviving sister, Elizabeth, one third to the child of Margaret, and one third in equal shares to the children of Martha.

The only significant difference between that case and this is that there the testator did include cross-limitations in the remainder between the children of the same parent. But, as the vice chancellor pointed out, this circumstance was rather an obstacle than an assistance in reaching the conclusion that a gift was to be implied as to Hannah's share.

In re Ridge's Trusts, 7 L. R. Ch. 665, is to the same effect, but I have not been referred to, nor have I discovered, any American case directly upon the point, although there is ample authority for gifts by implication in our own reports: Turner v. Fowler, 10 Watts 325; Pierce v. Hakes, 23 Pa. 231; Kerr et al. v. Verner, 66 Pa. 326; Jones et al. v. Cable, 114 Pa. 586.

Counsel have cited French's Estate, 292 Pa. 37, to show that cross-limitations will not be implied where the original gift is to a number of persons nominatim. The question there was whether, after the death of one life tenant, the survivors took the entire income as no gift in remainder took effect until the death of all the life tenants. Under such circumstances, any implied gift to the surviving life tenants must rest on the assumption that the gift of income was to a class, to be enjoyed by its members so long as any were living. Basing its decision, partly at least, on the fact that the gift was to certain persons nominatim, the court held that there was not a gift to a class and therefore there was an intestacy as to the share of income in question.

But in the case before us the implication rests upon the assumption drawn from the language of the whole deed, that if there were descendants [7] of any Riddle child the settlor desired them ultimately to receive the whole fund. The remainder is given to a class consisting of the unnamed descendants [8] of Mary Riddle's children. The prior gift to the Riddle children nominatim is not involved in the implication at all.

Clayton's Estate, 302 Pa. 468, Beilstein v. Beilstein, 194 Pa. 152, and Lippincott's Estate, 276 Pa. 283, apply the rule that where there is a gift over in the event of there being no persons of a specified class, and nothing is said as to what shall be done if there are such persons, the law will imply a gift to them if in existence at the time the gift over is to take effect. I find nothing in these cases to oppose the reasons upon which I base my conclusion, and indeed they appear to me to go further than the English cases, if not in quite the same direction.

Under either view of the matter, provision for the remainder has been made in the event of there being Riddle descendants, for if the language of the settlor is inadequate to cover the case of one child's dying without descendants the omission must be supplied by implication, and Hugh Riddle, Bettina Von Hutten, and Anna Scott Hart are entitled to the balance for distribution in the proportions already indicated.

### Conclusions of law

1. Hugh Riddle and Bettina Riddle von Hutten, children of John S. Riddle, were entitled to receive the one-third portion of the principal of the trust fund distributed to them by the trustee in 1906.

2. Anna Scott Hart, child of Betsy Fisher, is entitled to three fourths of the balance for distribution shown in the trustee's account.

3. Hugh Riddle and Bettina Riddle von Hutten are each entitled to one eighth of said balance.

4. The bonds of Texas & Pacific Railway Company acquired by the trustee in 1887 under the plan of reorganization of the said company were not the bonds set over to it by Thomas A. Scott.

5. It was the duty of the trustee to sell the bonds so acquired and to invest the proceeds in investments for trustees authorized by law.

### Decree nisi

And now, November 8, 1934, upon consideration of the foregoing case it is ordered, adjudged, and decreed as follows:

1. That all exceptions to the account of Fidelity-Philadelphia Trust Company, trustee for John S. Riddle et al. under the deed of trust of Thomas A. Scott dated March 15, 1880, are hereby dismissed.

2. That the said account, stated to November 6, 1933, is hereby approved and confirmed.

3. That the balance for distribution after the deduction of a commission to the trustee of $670 and of counsel fee of $700 be awarded to the persons and in the proportions set forth in the petition for distribution filed with said account.

The prothonotary is directed to enter a decree nisi and to notify the parties of the filing of this adjudication, and unless exceptions are filed thereto within 10 days to enter a final decree in accordance herewith.

### Opinion sur exceptions to adjudication

PARRY, J., February 28, 1935.—The facts of this case and the questions involved are fully discussed in the adjudication of the auditing judge, with which our consideration of the exceptions filed thereto is to be read.

On the question of surcharge of the trustee the exceptants advance three arguments.

First: That the two sets of bonds in question, if not the same securities, are to be treated as the same. This appears to be an afterthought, but we are not convinced by the arguments of counsel and concur in the reasoning and conclusion of the auditing judge that the two issues were different securities and are to be treated as such. Counsel cite cases in which the general rule of the ademption of legacies has been held not to apply and urge that for the same reasons, or by analogy, we should treat the new bonds as if they were the same as the old, since the trustee acquired them, not by the shifting of funds from one investment to another but merely because it happened to hold the old ones. However, the doctrine in regard to legacies has arisen from the court's efforts to give effect to the manifest intention of the testator to benefit a certain person, and if the thing given has, through no action of the testator, evolved into a different one the court assumes that the testator intended the new thing to be treated as its predecessor. In the case before us, however, there is no doubt of the settlor's intention in case of a change in the securities, as the deed of trust provides expressly for that event in the next to the last paragraph, which reads:

"And if any of the bonds hereby assigned or any other investments hereinafter constituting the said trust estate shall become due or be paid off, then the said trustee shall invest and keep invested the money received by reason thereof in such securities as the laws of the State of Pennsylvania now do or hereafter shall sanction as proper for the investment of trust funds."

From this, it is clear that the settlor wished the estate always to consist of the securities originally assigned or of legal investments for trustees. The company was unable to pay off its bonds with money, but it did so with new bonds. The old obligations to pay interest and principal were extinguished by the giving of new, different promises. While it is true that the mortgage accompanying the old bonds was not satisfied of record until years later, still it is perfectly clear that the parties regarded the new bonds as redeeming the old ones when the readjustment and reorganization became complete. On page 15 of the new mortgage we find the provision:

"Whereas . . . it may be unadvisable or impracticable to secure the immediate satisfaction or release of the said [old] mortgages, it is further covenanted and agreed that the bonds issued under the said several [old] mortgages, and deposited under the said plan [of reorganization], shall be transferred and delivered to the trustee of this mortgage to be held as security for the bonds to be issued under this present indenture of mortgage . . . until the

said [old] mortgages shall have been satisfied, or, in the judgment of the trustee of this mortgage it is prudent to cause the bonds so transferred and delivered to be canceled."

*Second:* That the auditing judge did not give sufficient consideration to the argument that the trustee, by its action in retaining the bonds from 1888 to 1926, estopped itself from asserting a duty to sell.

Undoubtedly the trustee was guilty of a very serious oversight in holding the bonds for so long a period, and had they depreciated a question of surcharge might have arisen. On the contrary, they increased in value and were sold at a very considerable profit. The contention is that, since through its ignorance or carelessness the trustee had for some time disregarded the mandate of the settlor, it must continue to disregard it without recourse after the error was discovered.

Upon what theory of estoppel this is predicated we are at a loss to discover. To say the least, the exceptants took no action to their detriment in reliance on the trustee's conduct.

*Third:* It is argued that the trustee, by selecting in 1901 the particular bonds in question as the corpus of the Riddle trust, thereafter had no power to sell them, whether "salvage" or not, because of the provision that the trustee was to "set apart from the corpus of the said trust estate securities of the face value of $100,000 and to hold the same, paying the income thereof, etc." We cannot adopt this view because we must read the deed as a whole, and when we do so it is perfectly obvious that the settlor intended all provisions of the deed to apply only to two classes of securities, those originally assigned or "legal investments". There is no ground for the assumption that a transfer of securities from one trust to the other would create a difference. The trustee could not have "held the same" if the bonds transferred for the Riddles had subsequently been paid off, and it should not have held them if they did not fall within the limitations of the deed.

In the elaboration of this argument, the exceptants urge that the confirmation of an account filed in 1914 has rendered the matter res adjudicata. The account referred to is concerned only with the Scott portion of the trust. In it the accountant showed the exchange of the bonds in 1888 and took credit for the transfer of 100 of them to itself as trustee for the Riddles. It rendered no account of the administration of the Riddle trust and the Riddles were not parties to the proceedings. The confirmation of the account appears at the end of the auditor's report and reads:

"It appearing that all parties in interest have agreed that the report of the auditor be confirmed, it is hereby approved and confirmed. Patterson, J., January 21, 1915."

This might preclude such parties from objecting to the retention of the bonds, but it would not have precluded any of the Riddles, and the trustee remained free to act if it was wrong to retain them. Nor do we think it decides the question of fact now before us, for the parties might have agreed to confirmation of the account regardless of the inclusion of "salvage" bonds in the estate, and under the circumstances the court would hardly of its own motion have raised an objection.

We are therefore of opinion that the new bonds were subject to the mandate of the deed of trust and were properly transformed into legal investments by the trustee.

On the question of distribution, the auditing judge found a gift in remainder either express or to be implied after the life estates of John, Betsy, and Robert to "the descendants of Mary Riddle's children" as a class, on the principle of

representation. It is pointed out that as Anna Dyke Scott was a child of Mary Riddle such construction would include her descendants among the donees of the remainder, and upon this counsel argue forcefully and at some length. Undoubtedly the meticulous scrutiny to which they subject the auditing judge's paraphrase of the language of the deed reveals some inaccuracy of statement, but this cannot alter the words or the meaning of the words of the deed, and the objection appears altogether specious, for the only children of Mary Riddle with whom the adjudication concerns itself are John, Betsy, and Robert. It is to their descendants only that the remainder is given by the deed, and but for the acuteness of counsel we should have thought the auditing judge's meaning perfectly clear. In order, however, that there may be no misunderstanding on the point, we revise his adjudication so that the words [1] "to the descendants of Mary Riddle's children" may read "to the descendants of Mary Riddle's said three children"; that in the following paragraph the words [2] "Mary Riddle's children" may read "Mary Riddle's said three children"; that the words [3] "life estates in the children" may read "life estates in the said three children"; that the words [4] "the gift is of income to the children" may read "the gift is of income to the said three children"; that the words [5] "one of Mary Riddle's children" may read "one of Mary Riddle's said three children"; that the words [6] "the descendants of the Riddle children as a class" may read "the descendants of the said three Riddle children as a class"; that the words [7] "of any Riddle child" may read "of any of the said three Riddle children"; and that the words [8] "of Mary Riddle's children" may read "of three of Mary Riddle's children".

If then by these emendations we have succeeded in clearing the language of the auditing judge of the taint of inaccuracy, we proceed to note that the point was raised merely as a basis for another argument, to wit, that if we limit the gift to the descendants of John, Betsy, and Robert then it is not a class gift under French's Estate, 292 Pa. 37, because we must name John, Betsy, and Robert in order to exclude Anna's descendants.

In common with the auditing judge, we cannot follow this. In French's Estate, the court refused to treat the named beneficiaries themselves as a class. Here the named beneficiaries are John, Betsy, and Robert, and though we think the language is such that they might be treated as a class there is no need to do so; it is their unnamed descendants who form the class to whom the entire remainder is given, if not by the express provisions of the deed then by reason of the gift over to the balance of the trust fund in default of descendants of John, Betsy, and Robert, from which we imply that the settlor wished such descendants, if there were any, ultimately to enjoy the entire principal set apart for the Riddles. The proportions in which the members of the class are to take is determined by the direction that the descendants are to receive their "respective shares" on reaching 21, together with the prior direction that they were to receive the income on the "principle of representation" before that time.

While there is room for argument upon the application of these directions, and we have found no precedent to guide us, we are of opinion that the auditing judge has made the distribution intended by the settlor by awarding the share upon which each parent had received the income to his or her own children and Robert's share to the descendants of the others per stirpes.   •

The administrator of the estate of Thomas A. Scott argues that this is erroneous because, had Robert died first, the children of the others would have received his share while their parents were still living, but we do not con-

362

sider this an insurmountable objection. It is quite consistent with the settlor's scheme of vesting the fund finally in the descendants of Betsy, John, and Robert that the remaindermen should enter upon the enjoyment of a part of it while their parents were still living, and we may point out that the construction contended for would lead to a most inconvenient result had Robert died first for, as he left no issue, it would have been necessary to hold up the distribution of his share, perhaps for years, until it appeared whether John and Betsy had also died without issue or whether one or both left issue, in order to determine whether the whole $100,000 reverted to the balance of the trust or the shares of those who died without issue fell back into the settlor's estate.

The construction adopted in the adjudication provides for the immediate determination of the recipients of any part of the remainder on the death of a life tenant.

The exceptions are dismissed, and the adjudication as revised and the decree are confirmed absolutely.